NOT RECOMMENDED FOR FULL TEXT PUBLICATION
File Name: 15a0644n.06

Case No. 14–4194

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Sep 18, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| MARK DRAGOMIER, *et al.*, | ) | |
| | ) | |
| **Plaintiffs-Appellants,** | ) | **ON APPEAL** FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| | ) | THE NORTHERN DISTRICT OF |
| v. | ) | OHIO |
| | ) | |
| LOCAL 1112 UAW, *et al.*, | ) | **OPINION** |
| | ) | |
| **Defendants-Appellees.** | ) | |

Before: CLAY and SUTTON, Circuit Judges; and WATSON, District Judge. [*]

**MICHAEL H. WATSON, District Judge.** Mark Dragomier and twenty-six other auto workers at the General Motors Assembly Plant in Lordstown, Ohio ("Appellants") appeal the district court's decision granting summary judgment to Appellees—General Motors ("GM"); Appellants' local union, Local 1112, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("Local 1112"); and International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW")—in this collective bargaining agreement case. For the following reasons, we must affirm.

## I. FACTS

Appellants are twenty-seven employees of the GM Assembly Plant in Lordstown, Ohio ("Lordstown Plant"). Appellees are Local 1112, UAW, and GM. Local 1112 and UAW (collectively, "the Unions") are labor organizations and the bargaining representatives of GM employees working at the Lordstown Plant.

---

[*] The Honorable Michael H. Watson, United States District Judge for the Southern District of Ohio, sitting by designation.

## A.  The 2007 Collective Bargaining Agreement

Prior to 2007, GM had been experiencing substantial financial losses.  To reduce labor costs, GM considered outsourcing "non-core" production jobs.[1]  However, the Unions strongly opposed the outsourcing of jobs.  Thus, GM and UAW (together, the "National Parties") engaged in extensive negotiations to prevent outsourcing union jobs and enable GM to avoid financial ruin.

The National Parties' negotiations ultimately resulted in GM abandoning its outsourcing plan and introducing a new two-tier wage structure whereby employees newly hired to perform non-core jobs would be paid less than employees performing core jobs, but the work for non-core jobs would not be outsourced.  Those negotiations were memorialized in the Memorandum of Understanding UAW-GM Entry Level Wage & Benefit Agreement ("Entry Level MOU"), which was incorporated in the 2007 Collective Bargaining Agreement ("CBA").

The Entry Level MOU states that it applies to "all entry level employees at all GM facilities covered by the UAW-GM National Agreement" and defines entry level employees as "regular employees hired on or after the date of" the Entry Level MOU.  R. 21-4 at 277.  It is undisputed that the Entry Level MOU did not apply to Appellants while they were temporary employees.

Union members expressed dissatisfaction with the Entry Level MOU because it permitted non-core jobs, which were considered preferred jobs, to be performed by lower-earning, entry-level employees when senior union members desired those jobs.  After receiving backlash, local unions, including Local 1112, raised concern over the new two-tier wage structure and Entry

---

[1] "Non-core" jobs generally encompassed those production positions that did not involve working on the vehicle assembly line, and "core" jobs were positions that entailed assembly-line work.  *See* R. 79-34 at 22.

Level MOU. The National Parties thereafter negotiated two documents that addressed these concerns: the Core/Non-Core and Entry Level Job Assignment Clarification dated March 3, 2008 ("2008 Clarification") and the Core/Non-Core Agreement dated March 28, 2008 ("2008 Agreement").

### B. Appellants' Employment with GM

Prior to April 30, 2007, all Appellants were temporary employees who performed core functions. Temporary employees had no guarantee of continued employment. Indeed, Appellants were either laid off or let go between May 1, 2007 and November 13, 2007. After the effective date of the 2007 CBA, Appellants were re-hired as temporary employees. The Entry Level MOU did not apply to Appellants when they were re-hired as temporary employees in 2007; rather, they were properly paid traditional wages.

In June 2008, after the National Parties negotiated the 2008 Clarification and 2008 Agreement, GM offered Appellants positions as regular, entry level employees. Local 1112 Shop Chairmen Ben Strickland ("Strickland") testified that he told union officials to share with Appellants that these positions would be paid the lower, entry level wage as opposed to the traditional wage Appellants were receiving as temporary employees. Appellants acknowledged they were told they would be paid lower wages, but they testified that union officials promised them the lower pay would be only temporary. Union officials apparently told Appellants that GM would very shortly be hiring entry level employees for a third shift and that the hiring of such employees would trigger the provisions of the 2008 Clarification and 2008 Agreement, bumping Appellants up to traditional wages. In reliance on those promises, Appellants accepted the regular position as entry level employees. Despite the assurances, GM never hired a third shift, and thus, Appellants were never moved to traditional wages.

3

Between July and December 2008, Strickland organized at least three meetings between various Appellants and union officials to discuss Appellants' dissatisfaction with being paid entry level wages.

Although Appellants contend that union officials failed to investigate their grievance, Strickland testified that he investigated the situation by speaking with UAW and GM officials. UAW officials informed Strickland that he did not have any grounds under the 2007 CBA to return Appellants to the traditional wages they had received as temporary employees. Strickland testified that he did not file a grievance on behalf of Appellants because he found, after talking with GM and UAW officials, that Appellants did not have a meritorious grievance.

UAW's constitution allows for a three-level appeal procedure when a union member believes that union officials wrongfully declined to file a requested grievance. First, a grievant appeals to the local union's membership. If the grievant's request is denied, the grievant then appeals to the International Executive Board ("IEB") for review. If the IEB upholds the refusal to file a grievance, then the grievant may appeal to the Public Review Board ("PRB"), which is composed of independent labor law experts.

Appellant Mark Dragomier initiated this process on behalf of himself and his fellow Appellants. Local 1112, the IEB, and the PRB each agreed with Strickland's decision to not file a grievance.

After exhausting the Unions' appeal process, Appellants filed a complaint in the United States District Court for the Northern District of Ohio against Local 1112, UAW, and GM. Plaintiffs asserted a hybrid § 301 action pursuant to 29 U.S.C. § 185 against all three Appellees and a separate claim for breach of the duty of fair representation pursuant to 29 U.S.C. § 159 against the Unions.

The district court granted summary judgment to Appellees, finding that Appellants failed to establish either a breach of the 2007 CBA or that the Unions breached their duty of fair representation. Appellants appeal both findings.

## II.  STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo. *1st Source Bank v. Wilson Bank & Trust*, 735 F.3d 500, 502 (6th Cir. 2013) (citation omitted). "In deciding a motion for summary judgment, this court views the factual evidence and draws all reasonable inferences in favor of the non-moving party." *Id.* (citation omitted). "To prevail, the movant must show 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)).

## III.  ANALYSIS

Appellants assert a hybrid claim against GM and the Unions under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and a breach of the duty of fair representation claim against the Unions under 29 U.S.C. § 159.

### A. Section 301 Hybrid Claim

"A hybrid § 301 suit implicates the interrelationship among a union member, his union, and his employer." *Garrish v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, 417 F.3d 590, 594 (6th Cir. 2005) (internal quotation marks and citation omitted). It "involves two constituent claims: breach of a collective bargaining agreement by the employer and breach of the duty of fair representation by the union." *Garrison v. Cassens Transp. Co.*, 334 F.3d 528, 538 (6th Cir. 2003) (quoting *Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 583 (6th Cir. 1994)). The two claims are interdependent—a plaintiff cannot

succeed against either party unless he or she demonstrates violations by both parties. *Id.* (citations omitted).

Here, Appellants contend GM breached the CBA when it paid Appellants entry level wages upon their hiring as permanent employees. They further maintain that the Unions breached their duty of fair representation by failing to file a grievance on Appellants' behalf based on that breach. Although the Unions certainly could (and should) have conducted a more thorough investigation into this issue and taken the time to explain thoroughly to Appellants their rationale for refusing to file a grievance, we ultimately find the Unions did not breach their duties of fair representation by failing to file a grievance. Because the failure to prove a breach of duty forecloses Appellants' hybrid claim, we do not address whether GM breached the CBA.

In order to prove a breach of the duty of fair representation, an employee must demonstrate that the union's actions or omissions during the grievance process were "arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S 171, 190 (1967) (internal citations omitted). In this case, Appellants do not assert that the Unions' actions were discriminatory or in bad faith; they contend only that the Unions acted arbitrarily. "[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." *Garrison*, 334 F.3d at 528 (quoting *Air Line Pilots Ass'n*, *Int'l v. O'Neill*, 499 U.S. 65, 67 (1991)). Neither mere negligence nor ordinary mistakes, errors, or flaws in judgment suffice. *Id.* (citing *United Steelworkers of Am. v. Rawson*, 495 U.S. 362, 372–73 (1990); *Walk v. P\*I\*E Nationwide, Inc.*, 958 F.2d 1323, 1326 (6th Cir. 1992)). Rather, a plaintiff must show the union's actions were "wholly irrational," a standard that is described in terms of "extreme arbitrariness." *Id.* at 538–39 (quoting *Black*, 15 F.3d at 585).

"A union acts arbitrarily by failing to take a basic and required step." *Vencl v. Int'l Union of Operating Eng'rs, Local 18*, 137 F.3d 420, 426 (6th Cir. 1998) (internal citation omitted). Moreover, "unions can unfairly represent members even when they act without bad faith." *Id.* (internal citation omitted). Thus, a union's failure to file a grievance on its members' behalf may constitute arbitrary behavior. *See, e.g.*, *Kelsey v. FormTech Indus.*, 305 F. App'x 266, 269 (6th Cir. 2008). That is, "a union may not ignore a *meritorious* grievance or process it in a perfunctory fashion. Unions are not, however, obligated to prosecute grievances that they find to be meritless." *Id.* (internal quotation marks and citation omitted).

As noted above, Appellants maintain that GM breached the CBA by improperly classifying and compensating Appellants as entry level employees when GM hired them as permanent employees in June 2008. They contend the Unions acted arbitrarily by failing to investigate and file a grievance for this alleged breach. Specifically, Appellants argue: (1) the Unions decided not to grieve Appellants' claim without first conducting an investigation, and (2) GM's breach was so clear that a grievance was required.

**1. Failure to Investigate**

Appellants argue that the Unions acted arbitrarily in failing to file a grievance because they failed to investigate Appellants' claim that GM breached the CBA before declining to grieve the issue. While the Unions' actions in response to Appellants' complaints were far from laudable, the high standard in this case forces us to affirm. The record reflects that the Unions conducted investigations sufficient to prevent a finding that the decision not to file a grievance, which was based on those investigations, was "wholly irrational."

### a. UAW's Investigation[2]

Whether UAW conducted an investigation turns on the actions of two of its representatives: Mike Grimes and John Mohan.

Following Appellants' hiring as permanent employees, Appellants complained to Strickland, their local union representative, about the reduction in wages from traditional to entry level. Strickland notified UAW national servicing representative Lee Jones, R. 79–30 at 160, who in turn notified the assistant director of the GM department of UAW, Mike Grimes. R. 79-34 at 8, 34, 36, 52. Grimes had been involved in the negotiations of the 2007 CBA, which he had recently "come out of" at the time Jones notified him of the issue. R. 79-34 at 43. Nevertheless, Grimes reviewed the relevant documents to "double-check" the entry-level hiring process and concluded that GM's actions did not constitute a breach. R. 79-34 at 36–48.

John Mohan, regional UAW representative, also weighed in on GM's alleged breach. Upon Strickland's request, Mohan attended a meeting with Strickland and members of the local union. R. 79-33 at 39, 101. Mohan looked at the wage progression portion of the 2007 CBA on the morning of the meeting, but he did not review any other relevant documents. R. 79-33 at 42. At the meeting, he expressed his view that GM did not violate the CBA. R. 79-33 at 45–49. Additionally, he and Strickland discussed Appellants' concerns and tried to find a "loophole," R. 79-30 at 244, but they were unsuccessful.

---

[2] As an initial matter, UAW argues that Appellants' claim must fail because: (1) they never asked a UAW representative to file a grievance based on their classification and compensation as entry level employees, and (2) that as an international union, UAW does not file grievances. Appellants respond that despite the lack of a formal grievance request, UAW was aware of Appellants' claim, and they submit that although UAW does not file grievances, it can direct local unions to do so. We need not address these arguments, as even assuming UAW knew of Appellants' claim and could direct Local 1112 to file a grievance, we find that the failure to do so was not arbitrary.

This conduct by UAW officials reflects an investigation of Appellants' claim. While the evidence does not establish that Mohan conducted a comprehensive review of the CBA in an effort to investigate the issue, it does show that he listened to the union members' complaints and discussed the issue with Strickland, even trying to find a loophole. More importantly, upon being informed of Appellants' complaints, Grimes, who was involved in the negotiation of the 2007 CBA, reviewed the Entry Level MOU and 2008 Agreement and concluded that GM did not breach the CBA.[3] Reviewing and/or discussing the Agreement's language is an appropriate response to a claim that GM violated that Agreement. Thus, while neither Mohan nor Grimes conducted a lengthy investigation, they considered Appellants' complaints and consulted the relevant documents in attempting to determine their merits. Appellants' claim that UAW's failure to direct Local 1112 to file a grievance was arbitrary because it was not based on an adequate investigation therefore fails.

### b. Local 1112's Investigation

Whether Local 1112 conducted an investigation turns on the actions of Strickland.

There appears to be a factual dispute regarding whether Strickland reviewed the relevant documents and came to his own, independent conclusion that GM's actions did not violate the CBA or whether he relied on others' representations that there was no breach. While Strickland generally references in his deposition testimony that he "reviewed everything" before determining whether to file a grievance, R. 79-30 at 151, 241, 260, Local 1112 explicitly points out that Strickland did not testify that he had the 2008 Clarification while he was making the decision, that there is no evidence that he had the 2008 Agreement before UAW provided it to

---

[3] Grimes's review of these documents belies Appellants' argument that any "secret deal" between Grimes and Schwartz to hire Appellants as permanent, entry level employees prevented UAW from seriously investigating their claim.

the PRB, and that Strickland testified that he could not recall when he first saw the 2008 Agreement. Br. 46–47 (citing R. 79-30 at 196).

It is undisputed, however, that Strickland discussed the lower pay with his UAW servicing representatives. R. 79-30 at 160 (Strickland notified Jones, his national UAW servicing representative, of Appellants' concerns); R. 79-30 at 244 (Strickland discussed the issue with Mohan, his regional UAW servicing representative, and tried to find a loophole). It is unclear whether Strickland spoke with Grimes directly. *See* R. 79-34 at 53 (Grimes testifying that he did not speak with Strickland directly); R. 79-30 at 160 (Strickland testifying that he spoke to Grimes). It is undisputed, however, that Grimes communicated his opinion to Jones, R. 79-34 at 37, who spoke with Strickland, R. 79-30 at 191 ("I had talked to my regional servicing rep. I've talked to my national servicing rep. Turned around and asked me if there was any angle that they may be seeing that I didn't see."). Strickland then relied on the opinions of these UAW representatives that GM had not breached the CBA. R. 79-30 at 76, 178, 190–91.

In addition to speaking with UAW representatives, Strickland held numerous individual and group meetings with Appellants to discuss their concerns and keep them apprised of the situation. R. 75 at ¶¶ 48, 132, 197, 227; R. 79-30 at 239, 243. While Strickland ultimately decided not to file a grievance, he explained to Appellant Dragomier the process of appealing his decision not to grieve the issue. R. 79-30 at 255–56.

This evidence demonstrates that although Strickland did not conduct the most thorough investigation, no rational trier of fact could find that he failed to conduct an investigation at all. He met with Appellants to discuss their concerns and contacted his regional and national servicing representatives about the issue, who agreed that GM had not breached the CBA. He even brainstormed with Mohan to attempt to find a loophole in the CBA that would entitle

Appellants to traditional wages but ultimately concluded there was none. Appellants themselves recognize that Strickland "did everything but file a grievance." App. Br. 49. Accordingly, Appellants' claim that Local 1112's failure to file a grievance was arbitrary because it was not based on an adequate investigation fails.[4]

### 2. Obviousness of the Breach

Appellants next argue that given the clear language of the CBA and subsequent clarifying documents, GM's actions were a clear violation of the CBA such that the Unions' failure to file a grievance was arbitrary. The Unions maintain that Appellants' claim for breach of the CBA is meritless, and therefore, their decision to not file a grievance was sound.

To determine whether GM clearly breached the CBA, we must first determine what the CBA required. "In construing a collective-bargaining agreement, courts apply traditional rules of contract interpretation as long as their application is consistent with federal labor policies." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. General Motors*, No. 14-1019, 2015 WL 2239507, at *4 (6th Cir. May 14, 2015) (internal quotation marks and citation omitted); *cf. Operating Eng'rs Local 324 Health Care Plan v. G & W Const. Co.*, 783 F. 3d 1045, 1051 (6th Cir. 2015) (internal citation omitted). "'Where the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent.'" *G & W Const.*, 783 F. 3d at 1051 (citation omitted); *see also Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am.*, 2015 WL 2239507 at *4. "[I]f the collective bargaining agreement is ambiguous . . . we may consider extrinsic evidence of the

---

[4] The Unions emphasize that Strickland and Grimes attempted to convince GM to grant Appellants traditional wages despite the language of the CBA. While such efforts are an example of the Unions' advocacy on behalf of Appellants, they are irrelevant to whether the Unions conducted an investigation of GM's alleged breach before deciding not to grieve the issue.

parties' intent at the time of execution." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am.*, 2015 WL 2239507 at *5 (internal quotation marks and citation omitted).

This case turns on the following documents: the 2007 CBA, the Entry Level MOU incorporated therein, the 2008 Clarification, and the 2008 Agreement. *See Plunkett v. Smurfit-Stone Container Corp.*, 247 F. App'x 604, 607 (6th Cir. 2007) ("'A collective bargaining agreement is not limited solely to the specific provisions of the basic labor contract formally executed by the parties, but it may also include . . . written side agreements and oral understandings.'" (quoting *Inlandboatmens Union of the Pacific v. Dutra Grp.*, 279 F.3d 1075, 1079 (9th Cir. 2002)).

> We begin with paragraph ninety-eight of the 2007 CBA, which provides in relevant part:
>
> [A]n employee who is laid off prior to acquiring seniority and who is re-employed at that plant within one year from the last day worked prior to layoff shall receive a rate upon re-employment which has the same relative position to the maximum base rate of the job classification as had been attained by the employee prior to layoff. Upon such re-employment, the credited rate progression period of an employee's prior period of employment at that plant shall be applied toward their rate progression to the maximum base rate of the job classification.

R. 75-2 at PageID # 3904.

Next, the Entry Level MOU discusses a two-tier wage system that defines a separate wage progression for entry level employees. By its own terms, the MOU explicitly applied to all entry level employees, whom it defined as regular employees hired into non-core work functions on or after the date of the MOU. R. 21-4 at PageID # 916. As such, the MOU did not apply to temporary employees.

The 2008 Clarification then discusses how GM will implement the entry level tier of wages. It begins by stating that the parties to the CBA understand that "[t]ransitioning the workforce may result in employees working together as either an entry level or non entry level

employee." R. 75-3 at PageID # 4552. It then outlines the process by which a plant would transition into the two-tier wage structure. First, seniority employees were provided a time period during which they would "remain eligible to exercise their seniority rights for non-core jobs." *Id.* The National Parties would then "determine the initial number of non core jobs at each facility[,]" after which the plant would exhaust the "existing hierarchy for job placement of seniority employees." *Id.* At that point, GM was permitted to "hire an entry level employee(s) to fill the opening(s) up to the number of non core jobs recorded at the facility." *Id.* The 2008 Clarification further provided that during the transition period, "the assignment of entry level and/or traditional employees to core and/or non core jobs [would] be determined by the local occupational grouping agreement." *Id.*

The 2008 Agreement also addresses the implementation of the new wage system. The Agreement explicitly states that it is "applicable only to those Non-Core and Temporary Employees hired into other-than-skilled positions." R. 75-4 at Page ID # 4554. It provides that the initial number of non-core employees that may be hired at each plant is based upon the number of non-core work functions identified at each plant. *Id.*

Appellants assert that the plain language of these documents counsels a finding that GM breached the CBA by hiring and compensating them as entry level employees. Their argument is as follows. None of the relevant documents explicitly state that all new permanent hires would be hired at entry level regardless of the core or non-core nature of their position. The definition of "entry level employee" therefore remained the definition articulated in the Entry Level MOU—regular employees, hired after a certain date, who perform non-core jobs. It is undisputed that the 2007 MOU, in this formulation, does not apply to Appellants because they did not perform non-core jobs. If the 2007 MOU does not apply to Appellants, it

follows that the 2008 Clarification and the 2008 Agreement—which address the implementation of the 2007 MOU—likewise do not apply to Appellants. Accordingly, Appellants should have been hired and compensated in accordance with the wage progression identified in paragraph ninety-eight of the 2007 CBA.

Appellants argue that given that the plain language so clearly required GM to hire Appellants according to paragraph ninety-eight, GM's failure to do so constituted a clear breach of the CBA such that the Unions' failure to file a grievance based on this claim was arbitrary, or in other words, "wholly irrational." While we sympathize with Appellants' treatment in this case by both GM and the Unions, we disagree.

Appellants are correct that the Entry Level MOU explicitly states that it only applies to employees performing non-core jobs. But the argument that the 2008 Clarification and 2008 Agreement do not somehow modify that definition is unavailing. As the district court pointed out, the language of the 2008 Clarification is inconsistent with Appellants' position that the definition of "entry level employee" remains an employee who performs non-core work. Specifically, the 2008 Clarification states: "As discussed in the Entry Level Wages and Benefits Subcommittee of those 2007 National Negotiations, it was clearly understood by the parties that: *'Transitioning the workforce may result in employees working together as either an entry level or non entry level employee'.* [sic]" R. 75-3 at PageID # 4452 (emphasis in original). The 2008 Clarification then outlines the process by which a plant would transition into the two-tier wage structure and states that "[d]uring the transition period . . . the assignment of entry level and/or traditional employees to core and/or non core jobs will be determined by the local occupational grouping agreement." *Id.*

14

We agree with the district court that such language would be arguably superfluous if the definition of "entry level employee" remained limited to those employees performing only non-core work. For example, if GM's cost-cutting incentives led it to fill all non-core jobs with entry level employees and entry level employees performed only non-core work, entry level and traditional employees would not work together. Further, the use of "and/or" in the second-mentioned provision suggests that both entry level and traditional employees can be assigned core functions. In light of the language in the 2008 Clarification, the fact that the clarifying documents do not explicitly change the definition of "entry level employee" does not mean the definition remained. Rather, the definition is ambiguous, at best, for Appellants. In any event, it was not "so clear" that GM breached the CBA that the Unions' decision not to file a grievance on that ground was arbitrary.

In sum, Appellants have failed to prove that the Unions breached their duty of fair representation by declining to file a grievance on their behalf. This failure dooms the remainder of their hybrid claim under § 301.

**B. Unions' Breach of Duty of Fair Representation Under 29 U.S.C. § 159(a)**

In addition to their hybrid § 301 claim, Appellants assert against the Unions an independent breach of the duty of fair representation claim under § 159(a) and 28 U.S.C. § 1337. Am. Compl. ¶ 1. Appellants' grounds for this claim are: (1) the Unions' failure to investigate and file grievances on Appellants' behalf regarding GM's alleged breach of the CBA; (2) the Unions' changing justification for their refusal to file a grievance; and (3) the Unions' failure to provide the core/non-core documents during the first two years of the internal appeals process.

Appellants' claim for breach of the duty of fair representation based on the Unions' failure to investigate and file a grievance relating to GM's breach of the CBA is based on the

15

same conduct discussed above. Indeed, Appellants' arguments for breach under § 159(a) virtually mirror the arguments made in conjunction with their § 301 claim. The district court therefore found that, because Appellants failed to establish a breach of the duty of fair representation for purposes of § 301, they also failed to establish a breach of the duty of fair representation for purposes of § 159(a).

The district court erred, however, in even considering Appellants' § 159(a) claim on this ground, as it did not have authority to do so. Because this claim is based on GM's alleged breach and the Union's failure to file a grievance, it is essentially a hybrid § 301 claim, and there was no authority for the district court to consider it under §159(a). *See Vencl v. Int'l Union of Operating Eng'rs, Local 18*, 137 F.3d 420, 424–25 (6th Cir. 1998).

Whether the Unions' changing justifications for their decisions not to file a grievance or their alleged withholding of documents during the internal appeal process are so closely related to GM's alleged breach of the CBA so as to mandate their consideration only as part of a § 301 claim is a much closer issue. Nonetheless, because these actions do not rise to the level of a breach of the Unions' duties of fair representation, it is not necessary to determine whether these arguments should have been considered only as part of the § 301 claim.

With respect to Appellants' second argument, Appellants fault the Unions for changing their justification for refusing to file a grievance. Appellants assert that, although the Unions have consistently argued GM did not breach the CBA, the Unions' rationale for *why* GM did not breach the CBA has changed over time. Throughout the entire internal appeals process, the Unions took the position that GM had been mistakenly paying Appellants traditional wages when it re-hired them as temporary employees in November 2007 and that GM merely caught its mistake when it hired them permanently in June 2008. It was not until Appellants filed the

instant suit that the Unions took the position that GM did not breach the CBA because the 2008 Clarification and 2008 Agreement modified the 2007 MOU to require all new permanent hires to be compensated as entry level employees regardless of whether they performed core or non-core jobs. Appellants' ultimate argument is somewhat unclear, however. They appear to argue first that the Unions' change in rationale demonstrates that the Unions breached their duty of fair representation by not performing an adequate investigation before deciding not to file a grievance, much the way evidence of pretext supports a finding of disability in the employment context. This argument fails, however, given our finding above that the Unions' investigation was not wholly irrational.

Next, Appellants appear to argue that the change in rationale is itself a breach of the duty of fair representation. The fact that the Unions did not once offer their current justification for refusing to file a grievance throughout the entire two-year internal appeals process further lends credence to our notion that Appellants were not treated as fairly as they should have been throughout this entire process. Again, however, Appellants have failed to show that the Unions' actions rise to the level of wholly irrational conduct, as they do not direct us to any authority for the proposition that a change in rationale is in and of itself a breach of the duty of fair representation, especially where the ultimate rationale is legally supportable.

Appellants' third argument, the failure to provide documents during the internal appeals process, also fails. First, the argument is too perfunctory to be adequately addressed. Appellants mention several times that the Unions failed to produce the 2008 Agreement and 2008 Clarification until just before the PRB hearing, App. Br. 39, 46, and 54, but they do not articulate an argument under § 159 except to say "Both the withholding of the Core/Non-Core documents from appellants and the constant change in justifications . . . should be considered

breaches of the duty of fair representation . . . ." *Id.* at 55. Appellants cite no case law supporting the notion that a union breaches its duty of fair representation by failing to timely disclose documents supporting its position during either the decision making timeframe or the period of internal appeals. Moreover, for the reasons stated by the district court, the Unions' failures to turn over the Entry Level MOU and 2008 clarifying documents did not amount to a breach of the duty of fair representation.

## IV.    CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.